**FLEMING COMPANIES, INC., Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Defendant.**

No. 4:03–CV–380.

United States District Court,
E.D. Texas,
Sherman Division.

June 4, 2004.

748

Clyde Moody Siebman, Siebman Reynolds Burg & Phillips LLP, Sherman, TX, Jeffrey R. Miller, Timothy D. Elliott, Kirkland & Ellis, Chicago, IL, for Plaintiff.

Ruth Harris Yeager, US Attorney's Office, Tyler, TX, Thomas Millet, US Dept of Justice, Washington, DC, for Defendant.

*ORDER **GRANTING** DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND **DENYING** FLEMING COMPANIES, INC.'S MOTION FOR SUMMARY JUDGMENT*

SCHELL, District Judge.

## I. INTRODUCTION

Before the court are the following written submissions:

a) "Defendant's Motion to Dismiss or Alternatively, for Summary Judgment" (Dkt.#6), filed on December 16, 2003;

b) "Fleming Companies, Inc.'s Opposition to the USDA's Motion to Dismiss or Alternatively, for Summary Judgment" (Dkt. #10), filed on January 13, 2004;

c) "Fleming Companies, Inc.'s Motion for Summary Judgment" (Dkt. #11), filed on January 14, 2004;

d) "Memorandum of the Frozen Potato Products Institute as Amicus Curiae in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment" (Dkt. #16), filed on February 12, 2004;

e) "Defendant's Reply in Support of Defendant's Motion to Dismiss or Alternatively, for Summary Judgment, and Defendant's Opposition to Fleming Companies, Inc.'s Motion for Summary Judgment" (Dkt. #18), filed on February 12, 2004;

f) "Fleming Companies, Inc.'s Reply in Support of Its Motion for Summary Judgment" (Dkt. #24), filed on March 2, 2004;

g) "Defendant's Sur–Reply in Support of Its Motion to Dismiss or Alternatively, for Summary Judgment" (Dkt. #25), filed on March 4, 2004; and

h) "Fleming Companies, Inc.'s Response to the USDA's Sur–Reply" (Dkt. #26), filed on March 9, 2004.

On May 2, 2003, the United States Department of Agriculture ("USDA") promulgated a new administrative rule establishing that battered and coated potato products are "fresh vegetables" under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. §§ 499a–499s (1996). Perishable Agricultural Commodities Act (PACA): Amending Regulations to Extend PACA Coverage to Fresh and Frozen Fruits and Vegetables That Are Coated or Battered, 68 Fed.Reg. 23,377, 23,377–78 (May 2, 2003) (to be codified at 7 C.F.R. pt. 46). In the event that a buyer of perishable agricultural commodities files for bankruptcy, PACA imposes a statutory trust in favor of unpaid sellers or suppliers of perishable agricultural commodities. § 499e(c). In that situation, sellers or shippers of perishable agricultural commodities are entitled to payment of their PACA trust claims before secured and unsecured creditors. *Id.*

Fleming Companies, Inc. ("Fleming"), an Oklahoma corporation with its principal place of business in Texas, is a grocery wholesaler and distributor. Pl.'s Compl., ¶ 3 (Dkt. #1). Fleming frequently buys and sells food products such as battered and coated french fries. *Id.* Fleming filed a bankruptcy petition under Chapter 11 on April 1, 2003. *Id.,* ¶ 4. Concerned that the USDA's new rule would force it to pay PACA trust claims and suffer severe financial hardship, Fleming sued the USDA on October 15, 2003. *Id.,* ¶ 6. Fleming seeks to invalidate the USDA's new rule. *Id.* ¶¶ 6, 7.

Neither Fleming nor the USDA argues that there exists a genuine issue of material fact in this case. *See* Fleming Companies, Inc.'s Mot. for Summ. J. at 17 (Dkt. #24). Thus, the court must decide whether the USDA's new rule is legally valid. *Id.* After careful consideration, the court is of the opinion that the USDA's motion for summary judgment should be GRANTED and Fleming Companies, Inc.'s motion for summary judgment should be DENIED.

## II. BACKGROUND

### A. PACA

In 1930, Congress passed PACA in order to regulate the conduct of those who buy perishable agricultural products. Per-

ishable Agricultural Commodities Act, ch. 436, 46 Stat. 531 (1930) (current version at 7 U.S.C. § 499a–499s (1996)). PACA requires buyers of perishable agricultural commodities to obtain a license from the Secretary of Agriculture. § 499c(a)-(b). Should a buyer unjustly refuse a shipment of perishable agricultural commodities or engage in fraudulent or unfair business practices, *id.* § 499b(1)-(4), that buyer will be liable for the seller's damages. *Id.* § 499e(a)-(b). Moreover, the Secretary of Agriculture may revoke the buyer's license. *Id.* §§ 499h(a). PACA also imposes a statutory trust in favor of unpaid sellers or suppliers of perishable agricultural commodities. *Id.* § 499e(c). If a buyer files for bankruptcy, sellers of perishable agricultural commodities are entitled to full payment of their PACA trust claims *Id.*

PACA defines the term "perishable agricultural commodities" as follows: "[A]ny of the following, whether or not frozen or packed in ice: Fresh fruits and vegetables of every kind and character." *Id.* § 499a(b)(4)(A). PACA does not elaborate further on the meaning of the term "fresh fruits and vegetables." *Id.* Congress has, however, given the Secretary of Agriculture authority to "make such rules, regulations, and orders as may be necessary to carry out the provisions of [PACA]." *Id.* § 499o.

## B. USDA Regulations Regarding PACA

Since 1940, the USDA has promulgated administrative regulations concerning the question of which agricultural products qualify as "fresh fruits and vegetables." *See, e.g.*, Regulations (Other Than Rules of Practice) Under the Perishable Agricultural Commodities Act, 1930, 6 Fed.Reg. 3,496, 3,496 (July 17, 1941) (to be codified at 7 C.F.R. pt. 46). For many years, the USDA defined that term as follows:

"Fresh fruits and fresh vegetables include all products in fresh form generally considered as perishable fruits and vegetables, whether or not packed in ice or held in common or cold storage." 7 C.F.R. § 46.2(u) (2002). That term does not, however, "include those perishable fruits and vegetables which have been manufactured into articles of food of a different kind or character." *Id.* Until recently, the USDA stated that the following operations did not change an agricultural product into a food of a different kind or character:

Water, steam, or oil blanching, chopping, color adding, curing, cutting, dicing, drying for the removal of surface moisture; fumigating, gassing, heating for insect control, ripening and coloring; removal of seed, pits, stems, calyx, husk, pods rind, skin, peel, et cetera; polishing, precooling, refrigerating, shredding, slicing, trimming, washing without or without chemicals; waxing, adding of sugar or other sweetening agents; adding ascorbic acid or other agents to retard oxidation; mixing of several kinds of sliced, chopped, or diced fruit or vegetables for packaging in any type of containers; or comparable methods of preparation.

*Id.*

## C. Battered and Coated Potato Products and the Ameriserve Bankruptcy Litigation

On January 31, 2000, Ameriserve Food Distribution, Inc. ("Ameriserve"), the largest food service distributor in the United States, filed a bankruptcy petition under Chapter 11. Perishable Agricultural Commodities Act (PACA): Amending Regulations to Extend PACA Coverage to Fresh and Frozen Fruits and Vegetables That Are Coated or Battered, 67 Fed.Reg. 77,-002, 77,002 (Dec. 16, 2002) (to be codified at 7 C.F.R. pt. 46). Although it settled

most PACA trust claims with its creditors, Ameriserve refused to settle five PACA trust claims involving coated and battered potato products. *Id.*

Previously, Ameriserve had supplied many restaurants in the United States with coated and battered potato products. *Id.* After the technology became available in the early 1990's, many sellers of potato products began to "coat or batter their potato products to preserve their color and crispness." *Id.* To coat and batter a potato product, one dips potato strips into a mixture of water and natural vegetable starch. *Id.* Then, a crisping or chemical leavening agent is added to the potato product. *Id.* Finally, the potato product is "air blown to remove all but a thin layer of coating, oil-blanched, and ... finally frozen." *Id.*

Coated and battered potato products are very popular in the United States. *Id.* Food service distributors like Ameriserve sell these products to earn substantial profits. *Id.* Fast food restaurants like McDonald's and Burger King buy these potato products because coating and battering preserve the crispness and color of french fries that are left under heating lamps. *Id.* Consumers eat these potato products because neither coating nor battering changes the taste or texture of a potato product. *Id.* From April 1999 to April 2000, more than two billion pounds of battered or coated potato products were produced in the United States. *Id.* The market value of these products exceeded eight hundred million dollars. *Id.*

Before it filed for bankruptcy, Ameriserve supplied thirty-six thousand restaurants in the United States with battered and coated potato products. *Id.* After it began the bankruptcy process, however, Ameriserve argued that PACA does not cover battered and coated potato products. *Id.* The value of the contested PACA trust claims exceeded eleven million dollars. *Id.* As a result, five of the largest french fry manufacturers in the United States sued Ameriserve. *Id.*

Following Ameriserve's refusal to pay these claims, the Frozen Potato Products Institute ("FPPI") asked the USDA for a written opinion regarding the question of whether battered and coated frozen potato products merit protection under PACA. *Id.* The FPPI is a national trade association whose members, all of whom are frozen potato processors, account for ninety-five percent of all frozen potato products in the United States. *Id.* After considering the FPPI's request, the USDA opined in August 2000 that battered and coated potato products are protected by PACA because "coating or battering does not alter the essential character of the potato products." *Id.*

### D. The USDA's Rulemaking Process

In June 2001, the FPPI petitioned the USDA under section 553(e) of the Administrative Procedure Act ("APA") to amend the definition of "fresh fruits and vegetables." *Id.* Specifically, the FPPI asked the USDA to codify its August 2000 opinion and conclude that battering and coating are processes that do not change a perishable vegetable into an "article[ ] of food of a different kind or character." *Id.* On December 16, 2002, the USDA published a proposed rule adding battering and coating to the list of processes that do not change a perishable vegetable into a food of a different kind or character. *Id.* The USDA gave interested parties until January 15, 2003 to comment on the new rule. *Id.*

During the notice and comment period, the USDA received two comments supporting the new rule. Perishable Agricultural Commodities Act (PACA): Amending Regulations to Extend PACA

Coverage to Fresh and Frozen Fruits and Vegetables That Are Coated or Battered, 68 Fed.Reg. 23,377, 23,377–78 (May 2, 2003) (to be codified at 7 C.F.R. pt. 46). The FPPI filed a comment supporting the new rule, as did Curt Maberry Farm, Inc. ("Maberry"). *Id.* Maberry commended the USDA for "progressively taking care of the farmer;" the FPPI supported the USDA because the FPPI believed the USDA was clarifying PACA. *Id.* at 23,378. The FPPI also believed that the USDA had previously recognized that battered and coated potato products are perishable agricultural commodities. *Id.* The USDA received no comments opposing the new rule. *Id.*

### E. The USDA's New Rule

On May 2, 2003, the USDA published the rule granting PACA protection to potato products that are battered and coated. *Id.* at 23,377. The rule became effective on June 2, 2003. *Id.* In announcing the new rule, the USDA stated its belief that coating and battering merely preserve the color, crispness, and texture of a potato product. *Id.* The USDA was of the opinion that neither battering nor coating alters "the essential character of the potato products." *Id.* Additionally, the USDA believed that battering and coating are processes quite similar to those already allowed by USDA regulations, such as oil blanching, chopping, and adding acsorbic acid. *Id.*

The USDA also concluded that excluding battered and coated potato products would contradict the Congressional intent behind PACA. *Id.* A substantial amount of the frozen potato products produced each year in the United States are coated and battered. Disallowing these products from receiving PACA protection would, in the USDA's opinion, harm a substantial part of the frozen potato products industry. *Id.* In the absence of a new rule, sellers of

these products would simply have to wait in line to be paid if the buyer filed for bankruptcy. *See id.*

### F. Fleming's Lawsuit

Although the USDA's new rule pleased french fry manufacturers, other third parties were displeased with the USDA. Four months after the USDA's new rule became effective, Fleming sued the USDA. Pl.'s Compl., ¶ 6. Fleming claims that the USDA's new rule violates the *Chevron* doctrine and argues that the USDA's rulemaking process was arbitrary and capricious. *Id.,* ¶ 6. Accordingly, Fleming asks the court to invalidate the USDA's new rule. *Id.* ¶¶ 6–7.

## III. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED R. CIV. P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law identifies which facts are material. *See id.* at 248, 106 S.Ct. 2505.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See id.* at 247, 106 S.Ct. 2505. If the

movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986). But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *See Celotex,* 477 U.S. at 322, 325, 106 S.Ct. 2548. In this instance, the movant is not required to offer evidence to negate the nonmovant's claim. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 885–86, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Once the movant has carried its burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." Fed R. Civ. P. 56(e). The nonmovant must adduce affirmative evidence. *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505.

◼ Summary judgment evidence is subject to the rules that govern the admissibility of evidence at trial. *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 175–76 (5th Cir.1990). In considering a motion for summary judgment, the court cannot make credibility determinations, weigh evidence, or draw inferences for the movant. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. The evidence of the nonmovant, however, is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor. *Id.*

## B. ANALYSIS

◼ As a threshold matter, the court must treat the USDA's motion to dismiss as a motion for summary judgment. "When matters outside the pleadings are presented to and not excluded by the district court, the district court must convert a motion to dismiss into a motion for summary judgment." *Burns v. Harris County Bail Bond Bd.,* 139 F.3d 513, 517 (5th Cir.1998). By tendering the administrative record to the court, the USDA has presented material to the court that falls outside the pleadings. Accordingly, the court converts the USDA's motion to dismiss under Rule 12(b)(6) into a motion for summary judgment. *See id.*

### 1. May Fleming Object to the USDA's New Rule?

◼ Fleming claims that its failure to object to the USDA's new rule during the notice and comment period should not bar it from challenging the USDA's new rule. Fleming Companies, Inc.'s Reply in Support of Its Mot. for Summ. J. at 12–14 (Dkt.# 24). Fleming relies heavily upon *City of Seabrook v. EPA,* 659 F.2d 1349 (5th Cir.1981). In that case, the Fifth Circuit held that parties may challenge an agency rule even if they fail to do so during the notice and comment period. *Id.* at 1360–61. Notably, the Court of Appeals frowned upon the waiver rule urged by the EPA in that case. *Id.* ("The rule urged by EPA would require everyone who wishes to protect himself from arbitrary agency action not only to become a faithful reader of the notices of proposed rulemaking each day in the *Federal Register,* but a psychic able to predict the possible changes that could be made...."). *City of Seabrook* has been cited with approval. *See Am. Forest & Paper Ass'n v. EPA,* 137 F.3d 291, 295 (5th Cir.1998) (following *City of Seabrook* ).

The USDA, however, contends that subsequent Fifth Circuit decisions have undermined *City of Seabrook's* validity. Def.'s Sur–Reply in Support of Its Mot. to Dismiss or Alternatively, for Summ. J. at 2–4 (Dkt.# 25). As the USDA notes, this circuit declined to follow *City of Seabrook* in *BCCA Appeal Group v. EPA,* 355 F.3d

817, 829 n. 10 (5th Cir.2003) and in *Texas Oil & Gas Association v. EPA,* 161 F.3d 923, 933 n. 7 (5th Cir.1998). *Id.* Thus, the question of whether a party's failure to object during the notice and comment period waives subsequent objections to an administrative rule is an open one.

■ This court must follow and apply Fifth Circuit precedent. This court may not, however, disregard a prior Fifth Circuit decision merely because that decision has been criticized or ignored. *Cf., e.g., Fioretti v. City of Holly Springs,* Civil Action No. 1:96cv17–D–D, 1997 WL 170319, at *7 n. 4, 1997 U.S. Dist. LEXIS 9876, at *22 n. 4 (N.D.Miss. Mar. 31, 1997). "It is a firm rule of this circuit that in the absence of an intervening contrary or superseding decision by this court sitting en banc or by the United States Supreme Court, a panel cannot overrule a prior panel's decision." *Burge v. Parish of St. Tammany,* 187 F.3d 452, 466 (5th Cir. 1999) (citations omitted). Neither the Supreme Court nor the Fifth Circuit, sitting en banc, has overruled *City of Seabrook.* Consequently, *City of Seabrook* is binding. *Texaco Inc. v. La. Land & Exploration Co.,* 995 F.2d 43, 44 (5th Cir.1993).

Overall, the USDA's argument that *City of Seabrook* is bad law is itself negated by Fifth Circuit precedent. *See Burge,* 187 F.3d at 466. The ongoing, intra-circuit duel over *City of Seabrook's* validity neither undermines nor abrogates that decision. *Id.* Until and unless the Supreme Court or the Fifth Circuit, sitting en banc, overrules *City of Seabrook,* this court must follow *City of Seabrook. Id.* Consequently, Fleming's failure to object during the notice and comment period neither deprives Fleming of its right to challenge the USDA's new rule nor robs this court of jurisdiction to adjudge that challenge. *See City of Seabrook,* 659 F.2d at 1360–61.

## 2. May Fleming Supplement the USDA's Administrative Record?

■ Fleming alleges that the court should allow it to introduce additional materials that the USDA should have considered during the rulemaking process. Fleming Companies, Inc.'s Reply in Support of Its Mot. for Summ. J. at 14–16. The USDA, however, contends that the court must consider only the administrative record. Def.'s Sur–Reply in Support of Its Mot. to Dismiss or Alternatively, for Summ. J. at 2. Because Fleming's request is improper under Fifth Circuit precedent, the court disallows Fleming from supplementing the administrative record.

■ Where, as here, the reviewing court examines an agency's action under APA, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The Fifth Circuit has hewed to the Supreme Court's rule. *See, e.g., Harris v. United States,* 19 F.3d 1090, 1096 n. 7 (5th Cir.1994). "Agency action is to be upheld, if at all, on the basis of the record before the agency at the time it made its decision." *Louisiana ex rel. Guste v. Verity,* 853 F.2d 322, 327 n. 8 (5th Cir.1988) (citation omitted)).

■ This rule applies both to the challenger and to the administrative agency. The challenger may not present and the court "may not consider evidence outside the administrative record when determining whether to uphold agency action." *Harris,* 19 F.3d at 1096 n. 7 (citations omitted). Additionally, administrative agencies may not "bolster ostensibly invalid regulatory action with after-the-fact explanations as to the regulation's validity." *Baylor Univ. Med. Ctr. v. Heckler,* 758 F.2d 1052, 1060 (5th Cir.1985).

■ Two limited exceptions to this rule exist. First, "administrative officials who participated in the action may explain their actions." *Harris,* 19 F.3d at 1096 n. 7 (citation omitted). Second, if the reviewing court deems the administrative record incomplete or concludes that the agency has failed to file the entire record, the court should remand the matter to the administrative agency for further consideration. *Camp,* 411 U.S. at 143, 93 S.Ct. 1241.

Here, the court does not believe that the USDA's administrative record is incomplete. Nor has Fleming established bad faith by the USDA or exceptional circumstances that would warrant supplementing the administrative record. Fleming, however, contends that the USDA's administrative record is incomplete because it does not contain materials that Fleming believes merit inclusion. Fleming Companies, Inc.'s Mot. for Summ. J. at 32–33. Specifically, Fleming argues that it sent materials to the USDA resulting from the AmeriServe bankruptcy proceedings. *Id.* Thus, according to Fleming, these materials should be part of the administrative record. Fleming Companies, Inc.'s Reply in Support of Its Mot. for Summ. J. at 14–15.

Fleming, however, gave these documents to the USDA more than a year and a half before the USDA began the rulemaking process. Because Fleming gave these documents to the USDA long before the notice and comment period, the USDA considered none of these documents during the notice and comment period. These documents solely related to one particular bankruptcy case in which the USDA did not intervene. Consequently, Fleming's submission of documents before the USDA began assembling an administrative record should not serve to broaden the administrative record. *Cf., e.g., Verity,* 853 F.2d

at 327 n. 8 ("Agency action is to be upheld, if at all, on the basis of the record before the agency at the time it made its decision." (citation omitted)).

Fleming argues that the Ninth Circuit's decision in *Asarco, Inc. v. EPA,* 616 F.2d 1153 (9th Cir.1980), mandates that this court supplement the administrative record. Fleming Companies, Inc.'s Resp. to the USDA's Sur–Reply at 2 (Dkt.# 26). The court disagrees for two reasons. First, this court is neither bound to follow nor obligated to consider decisions from the Ninth Circuit.

Second, even if *Asarco* was binding upon this court, *Asarco* does not support the precise remedy Fleming seeks. In that case, the court remanded the matter to the EPA for further consideration because the EPA's rule could not be legitimately examined on the administrative record. *Asarco,* 616 F.2d at 1160, 1162–63. Because the court declines to remand the matter to the USDA, Fleming's reliance on *Asarco* is unavailing. Fleming may not supplement the administrative record.

### 3. Does the USDA's New Rule Violate the *Chevron* Doctrine?

■ The court must now determine whether the USDA's new rule contradicts or is in accord with PACA. In making this determination, the court may not conduct a *de novo* review of the USDA's new rule. *See Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). Instead, the court begins by acknowledging the presumption that administrative agencies like the USDA "will act properly and according to law." *FCC v. Schreiber,* 381 U.S. 279, 296, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965).

■ In determining whether the USDA's new rule contradicts PACA, the court's analysis is governed by two-step approach established in *Chevron, U.S.A.,*

*Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron's* first step, the court answers the question of "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. The court first determines whether Congress has plainly "expressed its intent in the plain language of the statute." *Miss. Poultry Ass'n, Inc. v. Madigan,* 31 F.3d 293, 299 (5th Cir.1994) (en banc). Additionally, the court examines the statute's design, structure, and legislative history. *United States Auto. Ass'n v. Perry,* 102 F.3d 144, 146 n. 4 (5th Cir.1996) (per curiam). If the statute plainly addresses the precise question before the court, the court's work is done, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778 (footnote omitted).

■ If, however, the statute "is silent or ambiguous with respect to the specific issue," *id.* at 843, 104 S.Ct. 2778, the court proceeds to *Chevron's* second step. *Id.* The question the court must then answer is "whether the agency's answer is based on a permissible construction of the statute." *Id.* (footnote omitted). In making this determination, the court need not conclude that the agency's interpretation "was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. 2778 (citations omitted). Instead, the court examines whether the agency's interpretation "exceeds the bounds of the permissible." *Barnhart v. Walton,* 535 U.S. 212, 218, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (citations omitted). "The question is not whether [the court] might have preferred another way to interpret the statute, but whether the agency's

decision was a reasonable one." *Tex. Office of Pub. Util. Counsel v. FCC,* 265 F.3d 313, 320 (5th Cir.2001) (citation omitted).

■ The court's review under *Chevron's* second step becomes more deferential if the statute at issue allows an administrative agency to "make ... such rules and regulations as may be necessary to carry out the provisions of this Act." *Mourning v. Family Pubs. Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973) (footnote omitted). In that situation, the validity of an administrative rule "promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'" *Id.* (quotation and citation omitted) Moreover, the court must defer to the agency's interpretation of the statute even if the court would have interpreted the statute differently. *Pool Co. v. Cooper,* 274 F.3d 173, 177 n. 3 (5th Cir.2001). In short, an agency's interpretation of a statute it administers deserves considerable deference. *See United States v. Mead Corp.,* 533 U.S. 218, 227–29, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

### a. The First Step of the *Chevron* Doctrine

PACA defines "perishable agricultural commodities as 'any of the following, whether or not frozen or packed in ice: Fresh fruits and vegetables of every kind and character.'" § 499a(b)(4)(A). Thus, the court must determine whether PACA addresses the following issue: whether battered and coated frozen potato products qualify as "fresh vegetables" under PACA.

### i. PACA's Text

■ In interpreting a statute, courts have a duty to "give effect, if possible, to every clause and word of a statute." *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (quotations and citations omitted). Courts must

give words their ordinary meaning and avoid interpretations that render terms or clauses meaningless. *White v. Black,* 190 F.3d 366, 368 (5th Cir.1999). Thus, courts begin by examining a statute's plain language. *Perry,* 102 F.3d at 146.

■ There are occasions, however, when an examination of a statute's plain language proves to be a fruitless task. *Id.* Specifically, a statutory term is ambiguous if it is susceptible to more than one meaning. *Tex. Sav. & Comm. Bankers Ass'n v. Fed. Hous. Fin. Bd.,* 201 F.3d 551, 554–55 (5th Cir.2000). As the Fifth Circuit has noted, the mere existence of multiple meanings does not create ambiguity. *Madigan,* 31 F.3d at 306–08. Rather, ambiguity exists where statutory terms have "more than one accepted meaning." *Perry,* 102 F.3d at 146. If a term has multiple meanings based on definition, usage, and common understanding, it is ambiguous. *Id.*

■ The word "fresh," as Fleming notes, is defined to mean "recently made, produced, or harvested" and "not preserved, as by canning, smoking, or freezing." WEBSTER'S II NEW COLLEGE DICTIONARY 447 (2001). A second dictionary defines the word "fresh" to mean "not stale, sour, or decayed," "not altered by processing," and "having its original qualities unimpaired." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 466 (10th ed.1998). Relying on these definitions of the word "fresh," Fleming contends that battered and coated frozen potato products are not "fresh vegetables" under PACA. Fleming Companies, Inc.'s Mot. for Summ. J. at 22.

Another dictionary defines the word "fresh" to mean "not stale or spoiled" and "[r]ecently made, produced, or harvested." THE AMERICAN HERITAGE DICTIONARY 282 (1989). These two definitions support the USDA's position that battered and coated frozen potato products qualify as fresh vegetables. A battered and coated potato product is fresh so long as it has not rotted, perished, or spoiled. Under this definition, a potato that is harvested, battered, and coated qualifies as a "fresh vegetable" under PACA.

Having consulted these dictionaries, the court concludes that the word "fresh" has four accepted meanings that are relevant to this case: (1) not altered by processing; (2) not stale, rotted, spoiled, or perished; (3) recently made, produced, or harvested; and (4) not preserved, as by canning, smoking, or freezing. Consequently, "the 'battle of the dictionaries' does not resolve the ambiguity." *Perry,* 102 F.3d at 147. The court must now examine the statute as a whole to resolve this ambiguity. *Id.*

Relying on *Supreme Beef Processors, Inc. v. USDA,* 275 F.3d 432 (5th Cir.2001), Fleming argues that the USDA's new rule contradicts PACA's text. Fleming Companies, Inc.'s Mot. for Summ. J. at 20. In *Supreme Beef Processors, Inc.,* the Fifth Circuit examined the question of whether the USDA exceeded its authority under the Federal Meat Inspection Act ("FMIA") to establish standards regarding meat contamination. 275 F.3d at 439. The USDA promulgated new rules governing the amount of salmonella in meat products. *Id.* at 434–35. These rules, however, contradicted the text of FMIA. *Id.* at 440. Consequently, the court held that the USDA's regulations fell "outside of the statutory grant of rulemaking authority." *Id.* at 434.

Here, however, PACA is silent on the question of whether battered and coated potato products qualify as "fresh vegetables." § 499a(b)(4)(A). Moreover, PACA does not define the term "fresh vegetables." *Id.* Instead, PACA ambiguously states that "fresh fruits and vegetables of

every kind and character" are perishable agricultural commodities. *Id.* Because statutory ambiguity exists here, yet was absent in *Supreme Beef Processors, Inc.,* the latter case is inapposite.

### ii. PACA's Structure

■ As a threshold matter, the court notes that PACA is inherently ambiguous. PACA does not illuminate which food processes or operations place a fruit or vegetable outside the ambit of the phrase "of every kind and character." *Id.* PACA does not address the specific question of whether battered or coated frozen potatoes qualify as "[f]resh fruits and vegetables of every kind and character." *Id.* Nor does PACA explicitly define the term "[f]resh fruits and fresh vegetables." *Id.* Indeed, "[a] review of PACA reveals no explicit definition of the term 'fresh fruit[s and vegetables].'" *In re L. Natural Foods Corp.,* 199 B.R. 882, 886 (Bkrtcy.E.D.Pa. 1996).

If anything, PACA hints at a broad definition of the term. *See* § 499a(b)(4)(A). The expansive phrase "of every kind and character," which modifies the term "fresh fruits and vegetables," indicates that a fruit or vegetable may be subjected to certain food processes yet retain its "fresh" character. *See id.* Additionally, this phrase connotes that PACA covers many types of fresh fruits and vegetables. *See id.* Thus, the court's broader examination of PACA and its structure does not answer the question before the court. On this specific issue, a gap in the text exists. *See Perry,* 102 F.3d at 147–48 (citation and footnote omitted).

To bridge this statutory gap, the Secretary of Agriculture may "make such rules, regulations, and orders as may be necessary to carry out the provisions of [PACA]." § 499o. The USDA has implemented PACA for over sixty years by promulgating regulations regarding the meaning of the term "fresh fruits and vegetables." *Cf., e.g., In re L. Natural Foods Corp.,* 199 B.R. at 886. Because the term "fresh fruits and vegetables" is expansive yet ambiguous and because Congress mandated that the USDA administer PACA, Congress has not "directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. Rather, Congress "meant to leave resolution of th[is] ambiguity to the administrative agency." *Tex. Sav. & Comm. Bankers Ass'n,* 201 F.3d at 555 (citation omitted).

Fleming claims that Congress's failure to include battered and coated potato products in its definition of "perishable agricultural commodities" proves that the USDA's new rule contradicts PACA. Fleming Companies, Inc.'s Mot. for Summ. J. at 24. The court need not, however, agonize over this argument. Congressional silence "normally creates ambiguity. It does not resolve it." *Barnhart,* 535 U.S. at 218, 122 S.Ct. 1265. Because the question of whether battered and coated potato products qualify as "[f]resh fruits and vegetables of every kind and character," § 499a(b)(4)(A), is an open one, this argument is unpersuasive. The court must now examine whether PACA's legislative history provides an answer to this question.

### iii. PACA's Legislative History

■ "It is a rare case indeed in which legislative history alone will permit [the court] to find that 'Congress has ... directly addressed the precise question at issue.'" *Perry,* 102 F.3d at 148 n. 4 (alterations in original) (quotation omitted). In the debates preceding a statute's creation, Congress will often discuss one issue yet fail to discuss another issue. *See Tex. Sav. & Comm. Bankers Ass'n,* 201 F.3d at 555 n. 4. That situation is present in this case.

Congress discussed many issues before enacting PACA, but the meaning of the term "fresh fruits and vegetables" was not one of them. Instead, senators discussed the meaning of and offered amendments regarding the term "dealer," *see, e.g.,* 71 CONG. REC. 2195 (1929) (statement of Sen. King), and regarding the term "broker." *See, e.g., id.* at 2204 (statement of Sen. Walsh). During that debate, however, no senator elaborated on the meaning of the term "fresh fruits and vegetables." *See id.* at 2162–68, 2195–2237. Nor did any senator offer an amendment regarding that term. *Id.*

Other issues occupied Congress's time. In debating PACA, senators focused intently on various legal issues that PACA presented. Some senators worried that Congress was giving the USDA too much regulatory authority. *See, e.g., id.* at 2195–96 (statement of Sen. McKellar). Some senators worried that PACA would entangle buyers of agricultural products in litigation in far-flung courtrooms. *See, e.g., id.* at 2228 (statement of Sen. King). Other senators were concerned that the transactions PACA would govern did not affect interstate commerce. *See, e.g., id.* at 2167 (statement of Sen. Wheeler). One senator believed that the requirement that buyers obtain a license from the Secretary of Agriculture was quite unfair. *Id.* at 2236–37 (statement of Sen. Copeland). In short, Congress discussed the legal issues surrounding PACA extensively yet avoided discussing the meaning of the term "fresh fruits and vegetables" completely. *See id.* at 2162–68, 2195–2237. Thus, an examination of PACA's legislative history does not resolve the question before the court.

■ Fleming argues that PACA's legislative history demonstrates that Congress intended to aid small businesses who sell agricultural products, not protect food processing companies that sell battered and coated potato products. Fleming Companies, Inc.'s Mot. for Summ. J. at 24. PACA's legislative history does not, however, address the question of which agricultural products are "fresh fruits and vegetables." Where, as here, Congress does not discuss a particular issue at all, one cannot deduce Congressional intent from Congressional silence. *See Cent. Bank of Denver v. First Interstate Bank of Denver, N. A.,* 511 U.S. 164, 185, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). As one jurist has observed, a search for Congressional intent on an issue Congress did not discuss is a fool's errand. Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law,* 1989 DUKE L.J. 511, 517. Thus, the court declines to utilize Fleming's method of statutory interpretation.

The USDA's new rule satisfies the first step of the *Chevron* doctrine. Consequently, the court must proceed to *Chevron's* second step and determine whether the USDA's new rule "exceeds the bounds of the permissible." *Barnhart,* 535 U.S. at 218, 122 S.Ct. 1265 (citation omitted).

### b. The Second Step of the *Chevron* Doctrine

■ The court must now determine whether the USDA's new rule is based on a permissible interpretation of PACA. *Id.* Because Congress has granted the USDA discretion and authority to implement PACA, § 499o, the USDA's interpretations of PACA deserve significant deference. *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778. In evaluating whether the USDA's new rule is based on a permissible interpretation of PACA, the court must decide whether the USDA's new rule is consistent with PACA's legislative history and purpose. *Tex. Sav. & Comm. Bankers Ass'n,* 201 F.3d at 555–56.

### i. PACA's Legislative History

During the seventy-first Congress, a bill was introduced to "suppress unfair and

fraudulent practices in the marketing of perishable agricultural commodities in interstate and foreign commerce." 71 CONG. REC. 2163, 2163 (1929). After the House Committee on Agriculture held numerous hearings, members of Congress recognized that "each year the shippers and growers of [ ] commodities suffer severe losses due to unfair practices on the part of commission merchants, dealers, and brokers." H.R.REP. No. 71–1041, at 1 (1930). Specifically, buyers of perishable commodities would refuse, without justification, to accept shipments of fruits and vegetables. *Id.* at 2.

Litigation was not a feasible option for shippers and growers because the fruits and vegetables were highly perishable and because buyers and sellers were "often hundreds and frequently thousands of miles apart." *Id.* Thus, buyers' repeated refusals placed the growers and shippers of goods in a perilous situation. *Id.* Fraudulent practices on the part of merchants, dealers, and brokers was "one of the outstanding problems in the fruit and vegetable industry." *Id.*

To combat this problem, Congress enacted PACA. S. Res. 108, 71st Cong., 46 Stat. 531 (1930). The bill required that merchants, brokers, and dealers engaged in the buying and selling of perishable agricultural commodities obtain licenses from the Secretary of Agriculture. *Id.* at 533. In the event that these individuals unjustifiably refused delivery of perishable goods or engaged in fraudulent practices, the Secretary of Agriculture would investigate the incident. *Id.* at 532, 535. If a breach of PACA occurred, the violating party would pay the seller's damages and possibly lose his or her license. *Id.* at 534–35.

Ten years after enacting PACA, Congress amended PACA "to include as a perishable agricultural commodity cherries in brine." H.R.REP. No. 76–2059, at 1 (1940). After the amendment was proposed, the Secretary of Agriculture recommended its passage, stating that it "would not be in conflict with the program of the President." *Id.* at 2. Consequently, after 1940, the term "perishable agricultural commodity" meant two things: "cherries in brine as defined by the Secretary in accordance with trade usages" and "fresh fruits and vegetables of every kind and character." *Id.*

In 1956, Congress amended PACA and strengthened its enforcement mechanisms. S.REP. No. 84–2057, at 1–2 (1956). Among other things, the 1956 amendments to PACA made misrepresentation of a perishable agricultural product's "region of origin" a violation of PACA and eliminated the necessity of proving "fraudulent purpose" regarding the misbranding of any perishable agricultural commodity. *Id.* at 1. The USDA recommended passage of the amendments, noting that "[g]rowers, shippers, and buyers are concerned about the existing extent of misbranding and misrepresentation of grade and origin of fresh fruits and vegetables." *Id.* at 3. The 1956 amendments demonstrated that PACA is "admittedly and intentionally a 'tough' law." *Id.* at 1.

Twenty-eight years later, Congress amended PACA again. Congress noted that buyers, dealers, and brokers had "failed to pay for perishable agricultural commodities received ... or ha[d] been slow in making payment therefor." H.R.REP. No. 98–543, at 3 (1984). To provide additional protection to sellers, producers, and shippers of perishable agricultural commodities, Congress passed an amendment to PACA that provided for the imposition of a statutory trust, for the benefit of unpaid sellers, on all perishable agricultural commodities received by a buyer. *Id.* The trust would continue until

the seller received full payment for his her agricultural commodities. *See id.*

In the event that the buyer went into bankruptcy, the assets forming a PACA trust would be excluded from the bankruptcy estate. *See id.* Thus, unpaid sellers would receive priority over secured and unsecured creditors and would garner payment for their PACA trust claims. *Id.* The 1984 Congressional amendment to PACA again reflected Congress's concern for and desire to protect sellers of perishable agricultural commodities, individuals who "are often located thousands of miles from their customers." *Id.*

### ii. The USDA's Regulations Regarding PACA

Although its purpose was evident, PACA did not define the term "fresh fruits and vegetables." Perishable Agricultural Commodities Act, ch. 436, § 1, 46 Stat. 531, 531 (1930) (current version at 7 U.S.C. § 499a (1996)). That task was left to the USDA. *Cf. id.* at 537. Eleven years after PACA's enactment, the USDA promulgated various regulations "in order to carry out the powers vested in the Secretary [of Agriculture] by [PACA]." Regulations (Other Than Rules of Practice) Under the Perishable Agricultural Commodities Act, 1930, 6 Fed.Reg. 3,496, 3,496 (July 17, 1941) (to be codified at 7 C.F.R. pt. 46). Specifically, the USDA defined the term "fresh fruits and vegetables" as including "all products generally considered by the trade as perishable fruits and vegetables, whether or not frozen or packed in ice and whether or not held in common or cold storage, but does not include those which have been dried or manufactured into articles of food of a different character." *Id.* The USDA did not, however, delineate which manufacturing processes or operations would cause a fresh fruit or vegetable to become an "article[ ] of food of a different character." *Id.*

In 1960, the USDA addressed this precise issue. Specifically, the USDA offered a lengthy list of processes that would not be considered to have changed a fresh fruit or vegetable into "a food of a different kind or character." Regulations (Other Than Rules of Practice) Under the Perishable Agricultural Commodities Act, 1930, 25 Fed.Reg. 4,845, 4,846 (June 1, 1960) (to be codified at 7 C.F.R. pt. 46). The list provided that the following operations would not strip a product of PACA protection:

> Blanching, chopping, color adding, curing, cutting, dicing, drying for the removal of surface moisture, fumigating, gassing, heating for insect control, ripening and coloring, husking, icing, peeling, polishing, pre-cooling, refrigerating, shredding, slicing, trimming, washing with or without chemicals, waxing, adding of sugar or other sweetening agents, and ascorbic acid or other agents used to retard oxidation, or the mixing of several kinds of sliced, chopped, or diced fruits or vegetables for packaging in any type of containers, or comparable methods of preparation, where the product is not processed by heat to assure preservation. . . .

*Id.* at 4,846. The USDA also amended its prior definition of the term "fresh fruits and fresh vegetables" by deleting the phrase "by the trade." *See id.*

In 1996, the USDA added "oil blanching" to the list of processes that do not render a product unworthy of PACA protection. Regulations (Other Than Rules of Practice) Under the Perishable Agricultural Commodities Act, 1930, 61 Fed.Reg. 13,385, 13,385 (Mar. 27, 1996) (to be codified at 7 C.F.R. pt. 46). The rule "grant[ed] dealers in frozen oil-blanched products the same rights afforded dealers whose frozen product is water-blanched." *Id.* at 13,385. After the USDA published the 1996 rule,

the USDA received six comments support-ing and four comments opposing the new rule. *Id.* at 13,385–13,386.

Before the enactment of the 1996 rule, oil-blanched potato products were excluded from PACA protection. *See id.* at 13,386. Because oil-blanched potato products are in high demand, the USDA was of the opinion that their continued exclusion from PACA "poses substantial risk to farmers, shoppers, and processors who are extend-ing credit without the trust protection the Act affords to other dealers." *Id.* Thus, the USDA believed that a new administra-tive rule was necessary. *Id.* The 1996 rule was not challenged in a judicial proceed-ing.

### iii. The USDA's New Rule

■ The USDA's newest rule builds on the 1996 rule and on earlier administrative rules. In the new rule, which became effective on June 2, 2003, the following operations did not change an agricultural product into a food of a different kind or character:

> Water, steam, or oil blanching, batter-ing, coating, chopping, color adding, cur-ing, cutting, dicing, drying for the re-moval of surface moisture; fumigating, gassing, heating for insect control, rip-ening and coloring; removal of seed, pits, stems, calyx, husk, pods rind, skin, peel, et cetera; polishing, precooling, re-frigerating, shredding, slicing, trimming, washing without or without chemicals; waxing, adding of sugar or other sweet-ening agents; adding ascorbic acid or other agents to retard oxidation; mixing of several kinds of sliced, chopped, or diced fruit or vegetables for packaging in any type of containers; or comparable methods of preparation.

By stating that battering and coating do not change the kind or character of a fruit or vegetable, the USDA's new rule similar-ly broadens the list of processes that do

not strip a product of PACA protection. In turn, the USDA's new rule protects the sellers and shippers of battered and coated potato products from being denied pay-ment for their goods.

Frozen potato products constitute the largest frozen commodity in the United States. Perishable Agricultural Commodi-ties Act (PACA): Amending Regulations to Extend PACA Coverage to Fresh and Frozen Fruits and Vegetables That Are Coated or Battered, 68 Fed.Reg. 23,377, 23,377 (May 2, 2003) (to be codified at 7 C.F.R. pt. 46). The USDA asserts—and Fleming does not deny—that battered and coated potato products account for 26% of all frozen potato products in the United States. *Id.* The market value of these food products exceeds $800 million. *Id.* Invali-dating the USDA's new rule would deny those who sell these products the statutory protection established by PACA. *Id.* Such an action contradicts PACA, which applies to fresh vegetables "of every kind and character." § 499a(b)(4)(A).

The general purpose of PACA "is to regulate in interstate and foreign com-merce the marketing of fresh fruits and vegetables." H.R.REP. No. 71–1041, at 1 (1930). The specific question of which ag-ricultural products are "fresh fruits and vegetables," however, has been answered by the USDA for over sixty years. During this time, the USDA has gradually and reasonably refined the meaning of the term "fresh fruits and vegetables" to ac-count for industry developments.

The USDA's efforts have resulted in more agricultural products of varying character being covered by PACA. The USDA's new rule represents the latest step in this process. The rule serves PACA's remedial purpose by allowing an additional type of agricultural product to receive PACA protection. In short, the

USDA's new rule is consistent with PACA's purpose and legislative history.

To be sure, the court in *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1070–71 (2d Cir.1995) and the court in *In re Long John Silver's Rests.*, 230 B.R. 29, 34–35 (Bkrtcy.D.Del.1999) concluded that battered and coated frozen potato products are not "fresh vegetables" under PACA. Relying on these two non-binding cases, Fleming contends that the USDA's new rule is unreasonable. Fleming Companies, Inc.'s Mot. for Summ. J. at 14 n. 4, 33 n. 11. Because these two cases arose before the promulgation of the USDA's new rule, which includes battering and coating as operations that do not change a commodity into a food of a different kind or character, these two cases are inapplicable.

The USDA's new rule serves PACA's remedial purpose. Moreover, the USDA's new rule is based on a permissible interpretation of PACA. "It is not, of course, the only permissible construction, but it is one permissible construction, and that is enough." *Perry*, 102 F.3d at 148. Consequently, the USDA's new rule is valid under the *Chevron* doctrine.

### 4. Did the USDA's new rule result from reasoned decision-making?

 The court must now examine whether the USDA's new rule is the product of a reasoned decision-making process. In doing so, the court employs the APA's "arbitrary and capricious" standard of review. *Transitional Learning Comm. at Galveston, Inc. v. United States Office of Pers. Mgmt.*, 220 F.3d 427, 430 n. 2 (5th Cir.2000). Under the APA, the reviewing court may invalidate an agency's regulation if the court deems the rulemaking process "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000).

Although this standard of review "is by no means a rubber stamp," *United States v. Garner*, 767 F.2d 104, 116 (5th Cir.1985), the court "may not substitute its own judgment for that of the agency." *Tex. Oil & Gas Ass'n*, 161 F.3d at 933–34 (citation omitted). Moreover, this standard of review becomes more deferential where, as here, the court reviews an agency's interpretation of a statute it administers. *Tex. Coalition of Cities for Util. Issues v. FCC*, 324 F.3d 802, 811 (5th Cir.2003).

### a. Did the USDA Sufficiently Articulate the Reasons for Its New Rule?

 Before it promulgates an administrative rule, an administrative agency must achieve two goals. First, the agency must provide "a concise general statement of [the rule's] basis and purpose." 5 U.S.C. § 553(c) (2000). The agency must plainly "articulate [ ] its findings and the reasons for its policy choices, so that the court may ascertain whether it engaged in balanced, informed decisionmaking." *Tex. Power & Light Co. v. FCC*, 784 F.2d 1265, 1269 (5th Cir.1986) (footnote omitted). This requirement is essential for informed judicial review. *Cf. Chem. Mfrs. Ass'n v. EPA*, 899 F.2d 344, 359 (5th Cir.1990).

Here, the purpose of the USDA's new rule is logical and evident. Following Ameriserve's bankruptcy filing, the USDA believed that those who sell battered and coated potato products should receive PACA protection. Based on its expertise and experience in this area, the USDA believed that battering and coating are similar to processes already allowed under USDA regulations. Thus, the USDA provided a concise, informative statement of the new rule's background and purpose. Overall, the USDA sufficiently articulated the reasons why it enacted the new rule.

### b. Was the USDA's Notice and Comment Period Sufficient?

Second, the agency must give "interested parties an opportunity to participate in the rulemaking." § 553(c). After publishing the prospective rule, the agency must give third parties a chance to comment on the prospective rule. *Id.* Although the APA does not establish a minimum time period for third parties to submit comments, *id.*, the Fifth Circuit has observed that a thirty-day notice and comment period is sufficient. *Chem. Mfrs. Ass'n*, 899 F.2d at 347.

Here, the USDA gave interested parties thirty days to comment on the new rule. This notice and comment period suffices. *See id.* Thus, the USDA's rulemaking process was neither arbitrary nor capricious.

Fleming alleges that the USDA should have conducted an independent investigation during the rulemaking process and avers that the USDA should have examined current practices in the frozen potato products industry. Fleming Companies, Inc.'s Mot. for Summ. J. at 31–35. Fleming also contends that the USDA should have sought additional information regarding battered and coated frozen potato products. *Id.* The APA, however, "establishe[s] the maximum procedural requirements [that] Congress was willing to have the courts impose on agencies in conducting rulemaking procedures." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (footnote omitted). Although administrative agencies may add additional procedures to the rulemaking process, "reviewing courts are generally not free to impose them." *Id.* Here, Fleming has not shown bad faith on the part of the USDA or exceptional circumstances that would warrant additional

procedures. Moreover, the USDA's rulemaking process satisfies the APA's procedural requirements. Nothing more is required of the USDA, nor may this court impose additional procedures upon the USDA. *See id.* Although Fleming invites the court to exceed its role in reviewing the USDA's new rule, the court declines this invitation.

### IV. CONCLUSION

The USDA's new rule is valid under the *Chevron* doctrine and is the product of a legitimate rulemaking process. Thus, the USDA's motion for summary judgment is GRANTED and Fleming's motion for summary judgment is DENIED.

It is so ORDERED.